You may proceed. Good morning, Your Honors, and may it please the Court, my name is Scott Bonagoski. I represent the plaintiff-relators Christine Surwitz, Michael Ruhe, and Vicente Catala. I'd like to reserve five minutes of my time for rebuttal. Please watch the clock. Will do. Your Honors, my clients were medical sales reps who were taking part in a widespread fraud on the medical community committed by Masimo Corporation, who used their prestige in their SP02 set technology to convince people that a new technology that was unproven and based on simulated accuracy data met a standard that the device demonstrated that it never met. This is a KETAM case. Don't you have to demonstrate that they committed a fraud on the government? I have to demonstrate that they committed a fraud that led to the submission of a false claim to the government. I don't have to. I believe that I can. So you're arguing two sets of frauds, I take it. A fraud on the FDA, correct? So the fraud on the FDA is not the fraud that led to the false claim. I understand. Are you arguing that the FDA was defrauded? I am saying that along the way they did do that, yes. And then you're arguing that who was defrauded later? So all the health care providers who submitted claims to the government for reimbursement, all these nephrology clinics where the vast majority of the patients are on Medicare, also the sales of the devices to the Veterans Administration themselves. Let me ask, with respect to those, aren't the marketing materials, the materials given to the people who buy them, I'm not sure why anybody would buy this device, but they essentially say, look, it doesn't work all the time. It's sort of like, I guess the analogy I keep thinking of is that thermometer you hold up to your kid's head that shows that he's 97.2. You really don't think he's 97.2, but you know he doesn't have a fever. Given the disclosures made here, how could any of the people that it was sold to be defrauded? My question is, why would anybody buy it? Because they go on and on and on. It says this doesn't work. And there's many situations when it doesn't work. And it should, at most, be utilized as an early warning device. I mean, they told everybody it doesn't work. Yet people bought it. I don't understand. Well, Your Honor, I think that what you're looking at is you're looking at fine print buried in operators' manuals, things that people don't necessarily need. But that's a different argument. They still said it. I mean, they were truthful. We're selling you a device that doesn't always work. The reps, including my clients, testified, and the record shows, that they said this thing is accurate to within one gram per deciliter at first standard deviation. And the fact of the matter is, it wasn't. But they told people it was. They told people this thing is substantially equivalent to a co-oximeter. And it wasn't. That's why people bought it. Because they loved the fact that it was non-invasive. And they figured, hey, if I can get the same results from something where I don't need a finger stick, of course I'm gonna do it. And by the way, Medicare reimburses at $7.19 a test. What are we to do with this case with the fact that your clients made a complaint, the FDA sent out an investigator, they spent a week investigating the claims, and essentially said, we don't find anything. So that's a great question. Thank you. How are you? Yeah, no. But I am unfortunately constrained by the record. I am not allowed to tell you what happened after Joshua Sims's declaration that he submitted to the district court saying we had a- What date did he submit that? August of 2013. They hadn't made a final decision yet. Okay, so we have, we can take judicial notice of their filings with the SEC, and I think the most recent one I have is a 2013, and it indicates that the FDA's and the criminal investigation are ongoing. Right, but the Form 483 letters that the FDA did submit, am I allowed to go beyond the record? No, no, just stay on the record. Only if it's public record, or something we can take judicial- I believe it's public record, that there's 483 notices that they- Okay, well, excuse me, counsel. Sorry. You have to ask us to take judicial notice in a proper way if you want to go beyond the record. You can't just come in here and start talking about things that we haven't looked at, you haven't gotten properly before us, all right? I wanted to make sure not to do that. But the public record does disclose that the FDA came to, the record in this case discloses that the FDA came to Massimo, conducted an investigation, and then, what's the kindest way to put it, took no further action. So, what was given to the FDA in that early investigation, I think, if you look at the actual record, is not what we ultimately provided to the Department of Justice and the FDA afterward, when I took over the case in May, June, 2013, after the other firm had been sitting on it for two years. When I came in, we had meetings with the FDA, with the Department of Justice, that led to the declaration from Joshua Sim, saying they hadn't made a final decision, and I don't know if I'm able to orally make a request for judicial notice. No, file a motion and we'll consider it. What I will say is, if this is something that is issue determinative, I will absolutely make a request for judicial notice and put before you documents that will answer your question. My question was simply, what are we to make of it? On this record, is it a point that we ought to consider or not consider? In my opinion, no, because as Peggy Pence stated in her declaration, the FDA doesn't have to act. They can choose not to, they can wait. There are cases in the books where the FDA's waited years to prosecute somebody for something. So they don't have to act right away. So let's get back to the issue that both Judge Wardlaw and I are asking you about. I guess I can figure out why somebody might buy a machine that's not very accurate, if it at least gave me a gross impression of something. But I've looked at the disclosure materials and we have in the tort law something called the Learned Intermediary Doctrine where we say, you don't have to give warnings to the ultimate consumer if the doctor or the user has been given sufficient warnings. I read those warnings, they basically say, look, this is a grossly accurate way to measure. You shouldn't use it for diagnostic purposes. You shouldn't use it to, it'll give you a rough sense of what's going on and then you might decide to do more or less. Like Judge Wardlaw, I'm not sure I'd spend money for it, but why is it a fraud? Well, you might if Medicare reimbursed you for it. Maybe, but put that aside, why is it a fraud? So here's my problem with that line of thinking is, if you're titrating epigen, which is a dangerous drug, here is a black box warning from the FDA, this is the thing that they're giving these people in the nephrology clinics and the documents, Massimo's own internal emails among executives show, you have to have tight tolerances or you can die if this stuff is dosed properly, let alone if you dose the wrong amount. And so- But the guys who are getting it do have, or have been given this disclosure that it's not very accurate. So that's part of what they're being told, but they're also being told by a rep who's in their face with the accuracy bolt and look, this is what we can do, this is what the device does, this is how good it is, these are the results you get. And then Massimo's controlling the data as it comes back in most of these studies, so that the doctor doesn't even see the deviations unless Massimo wants them to. This is part of the reason why in the arbitration, Justice Neal had such a problem with the way that they marketed the device, is that they were saying one thing and the fine print said another. And to me, that sounds very much to me like you're committing a fraud on somebody who's very busy, who's running dozens of patients through, very, very critically ill patients through their practice every day, titrating very dangerous medications to them on the basis of a box that was certified by the FDA using a computer simulation instead of real devices. And the only evidence there is in the record of any real world testing they did shows that it failed virtually every time to meet that spec or even come close to it. The first device that they sold, the PRONTO, when they finally tested it in the real world during their beta testing in mid-2009, they were claiming accuracy of one gram per deciliter. The PRONTO was at 1.86, and it was off high or low by six in many cases. And so the other interesting thing is the PRONTO was cleared by the FDA using the old Radical 7's data that they'd collected in 2007, but when they paired the Radical 7 next to the PRONTO, head-to-head in the same thing, those devices were five grams off of each other in some cases. So it wasn't even performing as the same device. Let me ask the question I asked you before in a slightly different way. Let's assume the reps simply went out in selling these to users, said, this is a very complicated device, here are the disclosures, we think you'll find it useful, and didn't say more. Any fraud in that case? So you're saying they tell them, hey, this thing's off by five or six? No, no, they say, they just give them the disclosures that are in the materials. They say, here's the device, I'm not a doctor, I think it's a great device, but you ought to look at the disclosures. Any fraud? I would say yes for this reason. And the reason is, if you are a healthcare practitioner and you are using a device like this to titrate epigen, where a one gram per deciliter variation can cause serious health problems, and you, the rep, know this device can be off by five or six, I think- Isn't that what the disclosure materials say? No. It says, in gross form, it may not be accurate. But it doesn't say- Isn't that a pretty good disclosure? It does not say it can be off by five or six, and I guarantee you, if you walk into a nephrology clinic and you tell them this hemoglobin device can be off by five or six, they're going to show you the door. It would be absolute malpractice for a doctor to titrate epigen using a device that could be off by three, let alone six. Assuming that's true, where in the record could we find evidence that it was off by five or six? I have that. That is in exhibit 360, I believe, is the... And I'm going to have to give you the page site maybe when I come back on rebuttal if I need to. Exhibit 360 is the one. I think it's an AR4738, although I've got to check that. No, no, that's the Rev-E. I know it's exhibit 360. That's burned in my brain. But if I had to give you a page number and that 22 volumes, I don't know if I can do it off the top of my head. Well, okay. Well, you can do it when you come back. I'll do it when I come back. See, I'm looking at, take a look at ER 499 to 458. And I think what it said- Sorry, which one? 499, 449 to 458. And it seems to say as to total hemoglobin, the devices were accurate within the range of six to eight grams per deciliter, or at least plus or minus 1.0 GDL, which I'm not sure I know that, at the first standard deviation, which encompassed 68% of the population. Right. And that's the disclosure. Right. And so somebody buying this is being told, this will be accurate within, with those numbers I just read you, with respect to two-thirds of the population, but not the other third. Right, but the third standard deviation is something like 0.3%, where it'll be off by three. It's so tiny. It's a bell curve, right? Right, right. And as you get farther away from the one, and physicians understand- Yeah, but physician just bought a device that's been told this is only accurate two-thirds of the time. And that's what's disclosed, with respect to hemoglobin. It's saying it's only accurate to within one, two-thirds of the time, but you have to understand that if they understand what a standard deviation is in the first place, which not all of them do, but let's say they do, if they understand that, then they also understand that it is statistically improbable to go outside the third standard deviation, and yet the machine frequently did, including the ones sent to the nephrology clinics and the pediatrics offices, but this was not disclosed to them ever. They didn't even know- But it was disclosed to them that, with respect to one-third of the population, the device did not perform within the narrow parameters. They were informed that it could be off by, you know, as much as two within 95% of the population, within two, which is still not ideal for titrating EPO, but it's not the same thing as saying this device can be off by six. Off by six means you can have a patient who is at a 14, which is perfectly healthy for hemoglobin, when in reality they're at an eight, which means they need a blood transfusion. That's how bad this thing is. But we're not arguing about how good the device was. We're arguing about the quality of the disclosure given, and my problem is that, if I'm a doctor and I get something that says, this is accurate for two-thirds of the population, but as to the others, our accuracy numbers are wrong. These accuracy numbers don't apply. Haven't I gotten sufficient warning that I can't rely entirely on this? You've gotten warning that it may perform within those parameters, but what you haven't gotten, and what the sales force wasn't even given, because management hid it from them, is just how wildly inaccurate the thing could be. It's sort of like going back to the original purpose of the False Claims Act was, people were selling rifles and other munitions to the government that were faulty, right? So if you're going to war and you've got a rifle and you shoot it, and I can hit the bullseye two-thirds of the time, but one-third of the time it's gonna be a foot off this way, a foot off that way, maybe you still buy the rifle. But if you're told that, and then you take the gun and you find out that two-thirds of the time it shoots over in the corner, and the other two-thirds of the time it shoots, or one-third of the time it shoots over here, and every once in a while you're gonna hit the bullseye, to me, that is a materially different set of facts about the product that you are giving and selling that has not been disclosed. And it means that- If the disclosure in your gun case where this one shoots accurately two-thirds of the time. Sorry? If the disclosure in your gun case where this gun shoots accurately two-thirds of the time, you're saying I should have figured out that in the other third it would shoot close but not accurately? See, that's the difficulty. Their disclosure seems to me to say, look, this is like that handheld device. Don't use it to diagnose much, but it'll give you a sense. If you see something grossly off on this device, you ought to do something, but don't rely on it. And like Judge Wardlaw, I'm not sure why people would buy it, but why is that a fraud? So if that's the case, if that's what they're saying about the product, that is truly the message that the reps are giving about the product. And the testimony from them is that that was not the message they were giving. If that's the message they're giving, that you shouldn't use it for diagnosis, you shouldn't do this, then why are there so many marketing materials in here about using a diagnostic CPT code to get reimbursed from Medicare? Why are there so many marketing materials saying you can use it to facilitate diagnosis and treatment without a blood draw? If what they're saying is, hey, this is just an early warning device, you can maybe get a general idea of hemoglobin, then why did they go get a CPT code if they knew it wasn't diagnostic, if they knew it wasn't safe for that? And they told the FDA they weren't gonna use it for that, and then they went out and did. Well, they didn't tell the, they told the FDA that they, that they didn't tell them they weren't gonna use it for that. I've read the conference call. They didn't say, we will never use it for that. They said, we'll get it approved by adding an oximeter to it. You're thinking of 2010. I'm talking about the initial clearance in 2008 when Marguerite Tomlinson, in response to Neil Patel asking her, hey, we need you to follow the Clinical Laboratory Standards Institute standards for lab tests, and Marguerite Tomlinson, the compliance person at Massimo says, oh no, we don't need to do that. This isn't being used for diagnosis. It's just a monitor. It's for somebody who's in surgery, and they're already taking blood tests from them periodically. Okay, we're into your time you wanted to reserve. Let me just ask you one quick question. Under the False Claims Act, are material omissions actionable? Yes, they are, Your Honor. So, but knowing fraud isn't? It's knowing fraud. I believe it's knowing fraud. If the person making the representation knows that the omission of a, for example, you know, occasional or frequent five to six gram per deciliter error is going to cause the person not to buy and not to administer the test. All right, thank you. You can save your time. The law requires that there be evidence of a lie. There's no evidence of any lie at all. There can be a knowing omission also, can't there? No, this case law is very clear. No, no, if what you say is false because you've left something out of it, I'm not talking about your duty to say everything. I'm saying, if I say to you, it's a beautiful day outside, look, and I know that it's 12 degrees, I may, my statement is then made knowingly false, is it not? Well, but that could be knowingly false. We don't have that accusation here. The Massimo submitted the data as required by ISO 9919. Massimo was required to market its device according to the results it got under 9919. So Massimo must include and market its device according to the cleared FDA specification. It is undisputed that Massimo always did that. Now remember, Massimo did not have to aim to be at 1.0. There was no predecessor device that non-invasively measured hemoglobin. That was simply the result of Massimo's investigation. As Judge Carney noted, and as the declarations all show, the doctors thought this device would be useful even at 1.8 or even greater. Even the relators concede in their own testimony that doctors found the device to be very useful. And the reason why the device is useful and the reason why people do buy it is because it's non-invasive. It doesn't require the taking of any blood. The Hemacube, which was the other device out in the market, a point of care device, required to prick the finger or the skin to withdraw blood. And as Judge Carney noted and as the record showed, this device, the Massimo device, is better and is more accurate than the Hemacube. So there's the answer why the device is a useful device. Let me ask a question based on what your opponent had to say. Let's assume that all your dealings with the FDA were above board and straightforward and everything else, but that his clients were told to go out and lie. Wasn't the way I understood the case before I got here, but now let's assume that was the case. They were directed by Massimo to go out and lie. Would that state a claim under the False Claims Act? No, there's several problems with that. First of all, that's not on the record that we're talking about. No, I get to make up the hypotheticals. So why not? Would that evaluate the False Claims Act? Well, no, because now you need to have somebody who was lied to. Who's the person that would not have bought the product, but for the lie, which would have caused them to then seek reimbursement, which where reimbursement was then given only because they bought a product they otherwise wouldn't buy. You're on the point that I want to explore. I'm trying to figure out what has to be shown in a False Claims Act case. So let's assume for the record, for the moment, that the record showed that Massimo said to its reps, Rua and others, yeah, we've made full disclosure, but we're afraid if people read that, they won't buy it. So go tell them that this is terrific and there's no problems with ever using it. And they told that to doctors and doctors bought it. What would have to be shown to make that a False Claims Act case? Would you have to bring in a doctor who said, I wouldn't have bought it, but for that, or they did seem to have at least one nephrologist who returned it when he said, when he found out it's an accuracy or it's lack of utility to him. That doctor testified for us. I think the Dr. Germain, who said it wasn't useful for his study with certain kidney patients, interdelatic kidney patients. The point is the studies require that the data be gotten from healthy patients, adult volunteers, healthy patients under ISO 9919. But to your hypothetical, yes, it would have been nice if they had somebody say that I wouldn't have bought the device and buying the device. And therefore I made a claim I shouldn't have made. They had no evidence from any doctor at any time that the doctor was in any way misled. In fact, all the declarations from all the doctors all testified that of course they understand you can't replicate laboratory data in the field. And that's the misunderstanding with the presentation. The doctors, Dr. Sander, Dr. Goodman, Dr. Germain, all the doctors that testified in this case, they all said they understand that in the field with sick patients, you can't replicate exactly the data that's given to the FDA because the FDA wants well-controlled laboratory conditions from adult volunteers. It's interesting that the gun example was used. When you test a gun, you test it in a vacuum. You test it on a tripod. You test it where the pressure on the trigger is as minimal as possible. And then you say all the bullets fall within a two-inch radius. But if a person buys the gun and says, hey, I'm unable to get within a two-inch radius, does anybody think the gun is defective? No. It's you're confusing the field usability with laboratory well-controlled conditions with healthy adult volunteers. And that's the miscommunication we're having here. So they think because the data wasn't replicated in the field, it somehow shows Massimo misled the FDA somehow. That's not so. The FDA wasn't interested in field data. They want laboratory data under 99-19. There is the rub. So to the extent they claim that device is faulty, it's no good, why would somebody buy it? The leading case from the Ninth Circuit is the Wang case. The Wang case, which was the subject of subsequent en banc modification, is a well-known case here in the Ninth Circuit. And it specifically says that basically the relator's arguments are that the product is faulty. Faulty in quotes. He bases his claims on their self-critical assessment of their own work. This is on page 1421 of the Wang case. And then the Ninth Circuit, this court continues, and says the government knew of all these deficiencies. Just as you noted in the beginning of the argument, Massimo fully discloses the limitations, the confounders about the device. And since the government knew of the deficiencies and discussed them, there can't be any scienter. Well, but let's go to the doctors. That's where I was focusing. So let's assume as your opponent argues that after the FDA approval occurred, you learned that it was an inaccurate device in the field to a greater extent than the clinical stuff showed. Is there any obligation to disclose that to the physicians? No, you have to disclose to the physicians what the FDA allows you to say. So we are required to disclose to the FDA what's in the indications for use and the accuracy specification. You're not allowed to deviate. So what you do, if they really wanted to prove their case, is they do an ISO 9919 study and show that our study was somehow faulty. It was not. And in fact, subsequent 510Ks were filed with subsequent data. And in fact, it was disclosed to the FDA. In fact, in the 510K on the PRONTO 7, we even disclosed that some of the data came at 1.2, 1.1, 1.0, .9, .8, and the FDA was satisfied that .1 is a proper representation of the accuracy of the device. So the point that's made in the briefs and everything that the FDA came out and inspected and then went away and did nothing, that's really not relevant? No, it's very relevant. How is it relevant? It's relevant to show that Massimo in no way misled the government. It shows lack of... Is it really given the fact that the SEC filings reveal that it was still ongoing as of the time that you were submitting these declarations? It was still ongoing, but the relator's complaints were all disclosed to the FDA and the FDA came out in February of 2011 to examine exactly what was alleged. So it's a different investigation entirely that's reported in the SEC filings from Massimo? Well, I'm not quite familiar. There are, the FDA... Talks about a criminal investigation. There's no criminal investigation. There's no criminal investigation, complete... So you're saying your SEC disclosure is inaccurate? I don't know which one you're looking at. I'm looking at Form 10-Q. Let's see, does it have a date? You've got it at your site. Pardon me? Oh, yeah. It's... Let's see, page 78 out of 106. Talks about the third quarter, 2013. We were notified that the FDA and the United States Attorney's Office for the Central District of California Criminal Division are investigating the allegations regarding our non-invasive hemoglobin products. Yes, and I don't know if I can go beyond the record to tell you what happened, but there's nothing happening. Well, if there's something that we can take judicial notice of, you're welcome to submit some... I think if you can submit what you want to submit within a week of today, both of you, we'll take it from both of you, and then make a determination whether it's judicially noticeable. Yes. Is the 10-Q in the record? Well, but it's judicially noticeable. No, I understand, it's judicially noticeable. Did they submit it? No. No, has anybody submitted it to 10-Q? No, but they don't have to. It's a government document. Well, I understand, but since you're... I'm trying to find it. Oh, sorry. It's not in the record, right? Well... No, I found it. Okay, thank you. I also found it. Where's Caitlin? Yeah, so we all know the government did not intervene in this case, did not want to participate. The government did file one brief. They were only interested in one legal proposition. The government did not stand by the relators on this key 10-Q. Okay, so yes, I realize that. So what I understand you to be saying, it's something that I'm just coming to realize right now as we're sitting here, is there was a sort of truncated protocol to get the devices approved by the FDA. And that was based on, you followed... I'm trying to paraphrase your argument. You followed everything that was required to get that approval. And that did not require in the field studies. It required what you did pursuant to the roles that the FDA has. Correct. And then once it was approved under that protocol, all your disclosures conform to the protocol as it was approved. And you were not allowed to say anything else about the device. Correct. You must follow the FDA rules and represent what the FDA has approved. That is correct. So if you do that, then the conclusion can be that there can be no sign ter because you've done everything that the FDA has told you. Even if there's emails and other things that are questioning the operation of the device or the accuracy of the device. Correct. And in fact, with regard to those allegations, those were shown to the FDA. So when the FDA came in, we had to give the FDA everything they wanted in connection with the allegations made by the relators. Remember, as soon as the relators made their complaint and quit, we immediately sent those allegations to the FDA. We even... Tell me what's in the record here. That's what I'm... And I apologize for asking where that other thing was because I'm looking for it and I can't find it. Tell me what's in the record. What's in the record, as I understand it, with relation to the FDA's investigation, is you sent... It's undisputed that the letters were sent to the FDA. It's undisputed that the FDA came out and conducted a nine-day or so investigation. I may have the days off by one or two. Does the record disclose that the investigation resulted in no further activity or... Yes. Did you actually get a letter or something from the FDA that said, okay, we're happy? Yes, it's called the EIR, July 9th, 2003. And where's that in the record? Yes. That is in the record? Yes, it's in the record. Okay, I can find it. The EIR of July 9th. Do you have a record site to help? Yes, I do. That is the EIR. It's attached to the Kiani Declaration. And it's AER, I take it, or is it... AER. Right. It's... It's at AER 1213. In 2013, we, what was that, A... What was the page again? 1213, did you say? Yeah, that's disclosure of the data collection. We disclosed, but you want the EIR, that's where the FDA said... Yeah, where the FDA came back after the investigation and said whatever it said. I know it's in the Kiani Declaration. Is there, what I'm trying to find is whatever the FDA sent you. And you can... Your co-counsel, I think... Your co-counsel's found it, so. AER 1925. It's the letter to Mr. Kiani from Alonzo Cruz. It's Exhibit 27, page one. So AER 1925. Thank you. And that's May 9th, 2011. And then that's subsequent to the February visit. So the only concern, I have a remaining concern about the question of what your sales force was told to tell the doctors. Is there evidence that they were told not to represent it could be useful for diagnostic purposes? I know of no evidence where we told the sales folks to misrepresent the device in any way. So the answer was no. I know no evidence like that. Matter of fact, they're required to disclose the very materials that you've been alluding to, the manuals where it states exactly what the FDA allows you to say. And so even the relators testified that they did what they were supposed to and that the doctors knew that you couldn't replicate the data. The doctors know about the confounding factors that you can't replicate laboratory data in the field just like you can't shoot a gun and get within one inch of the target that you could in a laboratory. So the evidence is undisputed that no doctor was misled by anything that was said. And that's why all the doctors testified that they're well aware of the fact that you can't replicate laboratory data in the field because of the confounding factors which are disclosed in the manuals that are used. Two things are quite possible. One, that Macimo did nothing wrong. And two, that the product really wasn't effective. They could both be possible under this regulatory scheme, right? They could be, I, they could be possible. Both could be true. That that's, this isn't an either or situation. They could both be true. And that's probably why Justice Neal didn't use the Ketom summary judgment as res dudicata or clarostopil in the other case. Right. You agree? Yeah, Justice Neal obviously weighed, leaned on the field data and didn't, I think, appreciate the major difference between laboratory data under 9919 and field data. All right. That's a very possible scenario. But the key here is it's not a referendum about how good our device is. Right, right. Did we lie? Did we have the scienter to mislead to cause false claims against the government? There is no evidence that we misled anyone which led to somebody making a false claim to the government. With that, Judge Carney was absolutely correct under this record, the evidence was overwhelming in favor of Massimo of their good faith belief in the efficacy of their device. If there's no further questions. I have a question for you. Do you have a relative who's an attorney whose last name is, your last name is Ray? I do. R-E, R-E. I have a father who was a federal judge appointed by President Johnson. I have another brother who has a last name Ray. You may be thinking of another Ray. The name is not that. A Donald Ray. Donald Ray is, he doesn't think we're related. He doesn't know. Donald Ray, yes, I know of Donald Ray. Are you talking about Bill Ray? No, Bill Ray was the federal judge? No, Edward Ray. Edward Ray. Who sat from 1968 to 1991. What's he doing now? He passed away in 2006. Sorry to hear that. No further questions, it's been a pleasure. Thank you. Thank you. All right. Here it is, I finally found it. Internet connection here is no good. I know. This space looks as if it's closed. Okay. Okay, just to address some quick points. The beta site testing results is shown at AER 3777. And that shows what the results were after the beta site testing. And it shows that the Pronto was almost 1.9 grams per deciliter off at the first standard deviation. And that the Radical 7 was 1.5 off. And that importantly, since the same validation device, or validation testing for the Radical 7 was used to clear the Pronto, they didn't match each other. They didn't perform the same way as the other. That's number one point I'd like to make. Number two, about the FDA's EIR. The FDA did not get all of the evidence in that first go around that they got. But they did conduct an investigation and issue an EIR, right? They did conduct an investigation, right? But the FDA, after we went back to them, after the arbitration, after the session. Yeah, but I'm just looking for what's in the record here. So be careful. I'm not gonna go beyond the record. I'm just gonna say, we went back to them and gave them whatever they wanted from the 600,000 pages we had from the arbitration. And then Joshua Sims issued his declaration. It said, we are now looking at this new evidence from the relators, haven't made a decision yet. I will be submitting a request for judicial notice for what happened next. Okay, now. That's the point I'd like to make on that. Okay, and would you both do it by a week from today? Absolutely. So, I still wanna get back to, I wanna ask you to respond to something your opponent said, because it may be helpful to you. He says, look, if we disclose what our tests showed and our later testing, our later testing or later field testing shows that it was inaccurate, we're not required to disclose that to physicians because it's apples and oranges. What's your response to that? I think that is a bizarre position for a medical device manufacturer to take, that they simulate their test data to the FDA under lab conditions, find out the device in the real world doesn't come close to meeting that and they can't warn anybody. Yes, and the question is whether they can't. My question is whether or not it violates the False Claims Act not to then say, we've done more testing and we're not so sure about our. So they have an obligation, if the device does not meet a performance standard, right, to withdraw the device under the Food, Drug and Cosmetic Act. That is an obligation they have as a reasonable and responsible medical device manufacturer. But we're not dealing with that responsibility. We're dealing with representations they made to people. So my question is very simple. Do they have an obligation when selling the device to say, here's our FDA studies, they're all accurate, let's assume they've done everything correct so far, but we've been conducting some further studies and we're not so sure about some of this stuff or don't they have that obligation, yes or no? In my view, as a responsible medical device manufacturer, if you know that your device does not live up to the accuracy standards that you are stating to doctors, coupled with the knowledge that the accuracy standard you're stating to doctors was computer simulated instead of being conducted on a real device, you absolutely have an obligation to do that and to omit that material information is likely to lead to a sale for someone for whom one gram per deciliter at one standard deviation is enough and to fail to do that is fraud. And if you don't have any further questions. But is it actionable under the False Claims Act? That's the question. So it's a fraud, a knowing fraud that is likely, especially in the case of nephrology patients, most of whom are on Medicare, to lead to the submission of false claims to the government and in this case, we have evidence that they did sell it into the nephrology clinics. We have the 88-738 CPT code, which the evidence from Dr. Bradford's declaration shows was only from Massimo devices. There were no other devices that used 88-738 in the entire world. So every 88-738 CPT code hit is from a Massimo device that was sold to somebody. All right, thank you, counsel. Thank you, Your Honor. We're gonna take about a five minute recess. Thank counsel for all of the arguments today. They were very good. Thank you very much. All right, we'll start the recess.
judges: Pregerson, Wardlaw, Hurwitz